IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 27, 2007 Session

## STATE OF TENNESSEE v. DAVID HAROLD HANSON

**Direct Appeal from the Criminal Court for Anderson County**
**No. A4CR0208     James B. Scott, Judge**

---

**No. E2006-00883-CCA-R3-CD - Filed August 27, 2007**

---

The defendant, David Harold Hanson, was convicted of aggravated child abuse a Class A felony, and received a sentence of eighteen years imprisonment. On appeal, the defendant raises the following issues: (1) whether the evidence was sufficient to sustain his conviction; (2) whether the trial court erred in refusing to instruct the jury on the definition of "accidental means" as submitted by the defendant; (3) whether the trial court improperly instructed the jury on the "knowing" element of aggravated child abuse; and (4) whether the trial court erred by giving sequential jury instructions. Following our review of the record, the parties' briefs and the applicable law, we conclude that the evidence was insufficient to prove that the defendant possessed the requisite mental state for aggravated child abuse; and therefore, we reverse the judgment of the trial court and dismiss the case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Dismissed**

J.C. MCLIN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined and ROBERT W. WEDEMEYER, J., concurring in part and dissenting in part.

J. Thomas Marshall, Jr., Clinton, Tennessee, for the appellant, David Harold Hanson.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James N. Ramsey, District Attorney General; and Jan Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant was charged with two counts of aggravated child abuse against S.H., an infant.[1] The following evidence was presented at trial. Amanda Silcox, who described herself as the defendant's fiancée, testified that she and the defendant lived together and had two children together. The couples' first child, S.H., was born on May 22, 2003.[2] S.H. weighed seven pounds, thirteen ounces and was a normal baby when she came home from the hospital. Ms. Silcox took care of S.H. for the first six-to-seven weeks after she was born but then went back to work at the Sonic restaurant in Clinton, Tennessee on "July 7th or 8th."

Ms. Silcox testified that she worked over forty hours a week at Sonic. While she worked at Sonic, the defendant took care of S.H. at their home in Oak Ridge. On July 13, 2003, Ms. Silcox returned home from work around 7:00 p.m. and found the defendant upset and crying. The defendant told her that he had been carrying S.H. and a basket of laundry at the same time and fell on some stairs. The defendant also indicated that they should take S.H. to the hospital. Ms. Silcox went over to the crib where S.H. was lying asleep. Ms. Silcox noticed that S.H.'s right leg was "swollen and bluish-purple," so she and the defendant took S.H. to the hospital. Ms. Silcox recalled that they did not take S.H. to Oak Ridge Hospital which was near their house; instead, they took S.H. to Children's Hospital in Knoxville. Ms. Silcox explained that they took S.H. to the Children's Hospital because her relatives had been to that hospital before and the hospital was "for children."

Ms. Silcox testified that after waiting in the emergency room for a couple of hours, S.H. was examined by a doctor. During the examination, the doctor moved S.H.'s leg and she cried a little, but she did not cry when the doctor moved the other parts of her body. The doctor placed S.H.'s leg in a splint and told Ms. Silcox to give S.H. some Baby Tylenol. The doctor also told Ms. Silcox to make an appointment with a pediatrician in two or three days. Ms. Silcox did not wait. She and the defendant took S.H. to see the pediatrician, Dr. Carl Morris, on July 15, 2003. Dr. Morris examined S.H. and told Ms. Silcox to take her back to Children's Hospital for more x-rays, which Ms. Silcox did on the same day. At the hospital, S.H.'s leg was x-rayed again. Ms. Silcox was told to come back the next day to have Dr. Mark Turner, an orthopedic specialist, look at S.H. Afterwards, Ms. Silcox took S.H. home. The next day, Ms. Silcox took S.H. to the orthopedic specialist for more x-rays and then returned home.

Ms. Silcox testified that on July 24, 2003, she took S.H. to Dr. Morris for her two-month check-up. After Dr. Morris performed a routine examination of S.H., he informed Ms. Silcox that he wanted S.H. to undergo a full-body skeletal x-ray at Children's Hospital. Ms. Silcox complied and took S.H. to Children's Hospital. However, Ms. Silcox was not allowed to take S.H. home after she was examined. Instead, S.H. was placed in the custody of the Department of Children's Services (DCS). Thereafter, Ms. Silcox was told that S.H. had injuries other than the ones to her right leg. When questioned by Police Investigator Gary Anders, Ms. Silcox told Anders that she observed the defendant lift S.H. into the air and bring her back down twice on the same occasion. Ms. Silcox

---

[1] Because the victim is an infant, we have determined to refer to her by her initials.

[2] The couple had a second child, a boy, who was born on December 16, 2004.

asserted that S.H. laughed when the defendant did this. Ms. Silcox noted that S.H. was about a month or month-and-a-half old when the defendant lifted S.H. into the air. Ms. Silcox acknowledged that she loved the defendant and chose to stay with him even though it meant that S.H. would remain in the custody of DCS. Ms. Silcox noted that she let co-workers and relatives hold S.H. In fact, her mother and father took care of S.H. for a couple of days. Ms. Silcox also stated that she had never observed the defendant express anger toward S.H. or treat S.H. in a way that would cause her injury.

Investigator Gary Anders was called to testify for the sole purpose of impeaching part of Ms. Silcox's testimony. According to Investigator Anders, Ms. Silcox told him that she saw the defendant "throw S.H. up in the air and catch her on the way down, and he may have grabbed her too hard and possibly caused the impact." On cross-examination, Investigator Anders noted that Ms. Silcox said that she did not think the defendant had injured S.H.

Lori Nunley testified that she was the emergency room physician who saw S.H. on July 24, 2003, at Children's Hospital. S.H. was referred to the hospital for a total body x-ray because she had sustained suspicious looking leg fractures. S.H. was brought to the hospital by Ms. Silcox. According to Dr. Nunley, S.H. appeared alert, not particularly fussy, and well-fed. However, S.H.'s hygiene was marginal, having some dirt underneath her fingernails and toenails. S.H. also had a small, fading bruise about the size of a pinky fingernail near the middle of her chest. Dr. Nunley observed that the bottom portion of S.H.'s right leg was very swollen, had bruising, and was purple-blue in coloration. The coloration was especially noticeable around the front of her right ankle. Dr. Nunley also observed that the sole of S.H.'s right foot had bruising and she had a blister on her toe, probably from the splint she had been wearing. S.H.'s left leg was tender but showed no visible signs of bruising.

Dr. Nunley testified that after she reviewed S.H.'s x-rays, she found multiple fractures on both of S.H.'s legs and on her chest. She described the leg fractures as "corner" or "bucket-handle" fractures which were considered to be caused exclusively by child abuse. Dr. Nunley also noted that the rib fractures were worrisome and "highly suspicious for child abuse." Dr. Nunley opined that the fractures found on S.H.'s legs were not consistent with the circumstances of an adult falling on top of a baby. She explained:

> Generally, the type of fracture you would see in a long bone in an arm or a leg from a fall would be a transverse fracture, meaning that a long portion of the bone is broken in half perpendicular to the long axis of the bone. Sometimes there can be fractures that are more angled or can sometimes even be a little spiraled. That does not describe [S.H.'s] fractures.

Based on her experience and expertise, Dr. Nunley opined that S.H.'s fractures were consistent with a child being violently shaken or from extreme rotation and twisting motion where a child's arms and legs flail back and forth violently. Dr. Nunley discounted the theory that S.H.'s fractures could have been caused by changing her diaper, yanking her legs, or turning her over by her leg. Rather,

Dr. Nunley reiterated that S.H. had fractures on both sides of her legs, and these fractures were consistent with a very forceful, twisting motion or a wild, flailing motion.

Dr. Nunley testified that she ruled out "brittle bone disease" because S.H. did not show any of the associated signs or symptoms and she had a rather benign medical history. Dr. Nunley diagnosed S.H. as a victim of battered child syndrome, and therefore, Dr. Nunley called DCS. Dr. Nunley acknowledged that the ophthalmologist, who later examined S.H., did not find any retinal hemorrhages or bleeding in the back of her eyes which is often associated with shaking a baby. However, Dr. Nunley asserted that she could not rule out baby shaking with 100% certainty because of the fractures.

Dr. Nunley testified that S.H.'s rib fractures were located on both sides of her ribs. Thus, Dr. Nunley opined that these fractures were caused by forcible squeezing because a baby's ribs are very pliable. Dr. Nunley also opined that the rib fractures were older than the leg fractures. Dr. Nunley further opined that movement of S.H.'s legs would cause her extreme physical pain. However, Dr. Nunley acknowledged that it was difficult to measure how much pain an infant felt and the infant would have no memory of the pain suffered. Dr. Nunley recalled that after reviewing the x-rays on July 24, she reviewed the earlier x-rays. She saw the "bucket-handle" fractures on the July 15 x-rays but she did not see the fractures on the initial x-rays taken prior to July 15.

Dr. Sidney Roberts testified that he specialized in pediatric radiology at Children's Hospital. On July 14, 2003, he reviewed the initial x-rays of S.H.'s right ankle but did not perceive any fractures at the time. On July 15, 2003, he reviewed additional x-rays taken of S.H. and found small fractures on S.H.'s lower right leg. Although he read the parents' explanation of how S.H.'s injury occurred – that her father had fallen down the steps with her – Dr. Roberts called S.H.'s pediatrician, Dr. Morris, and voiced his suspicion of child abuse based on the location and appearance of the fractures. Thereafter, Dr. Morris ordered full body x-rays of S.H. on July 24, 2003, and Dr. Roberts reviewed them. According to Dr. Roberts, the x-rays showed that S.H.'s right leg had four fractures: below her knee, in the fibula and tibia, and near her ankle. The x-rays also showed two fractures to the tibia and fibula of S.H.'s left leg. The x-rays further revealed multiple fractures on both sides of S.H.'s ribs – the right posterior: third, fourth, tenth and eleventh; and the left posterior: third, fourth, fifth, tenth and eleventh. Dr. Roberts explained that the term "posterior" meant "towards the back."

According to Dr. Roberts, S.H. did not suffer from "brittle bone disease" because she had a normal amount of calcium in her bones and there was no irregularity of the cartilage surfaces. Dr. Roberts acknowledged that it was conceivable that the injury to S.H.'s right ankle may have been caused by a fall if accompanied by a twisting or torsion traction of her leg upon impact. However, Dr. Roberts asserted that a fall did not account for the fairly identical fractures on both of S.H.'s legs. Dr. Roberts stated that most falls involving infants result in fractures of the long bone in the shaft which were not the type of fractures S.H. had. Dr. Roberts noted that S.H.'s leg fractures were consistent with a twisting or pulling injury. Dr. Roberts opined that S.H.'s rib fractures were caused by a forceful squeezing motion with adult hands.

Dr. Roberts opined that picking up S.H. by both legs or one leg would not create enough force to cause the fractures in her legs. He further opined that it was unlikely S.H.'s leg injuries were caused by a fall in which someone grabbed her legs to keep her from hitting her head. He explained that the person would have to grab and twist both legs in a matter of seconds. Similarly, Dr. Roberts did not believe that tossing S.H. into the air and catching her would create enough force to cause the fractures. Dr. Robert's surmised that S.H.'s fractures were likely a result of a squeezing action rather than a shaking action.

Dr. Roberts estimated that S.H.'s rib fractures occurred three to five weeks prior to July 24, 2003, and either occurred simultaneously or within seven to ten days of each other. Dr. Roberts stated that his estimation was based on the healing reaction that had occurred around the fractures. Dr. Roberts ruled out the possibility that S.H.'s rib fractures were eight weeks old. Dr. Roberts acknowledged the possibility that these injuries may have been caused "by an individual who didn't realize they had caused the fracture." Based on his review of the x-rays, Dr. Roberts concluded that S.H.'s leg fractures occurred within 24 to 48 hours of July 13, 2003. Dr. Roberts opined that S.H.'s fractures probably caused her pain until they stabilized and healed. Dr. Roberts described S.H.'s fractures as a discontinuity or destruction in the connection between the cartilage and the bone. Dr. Roberts said the fractures were not like an actual break through the bone but little breaks in the bone.

Dr. Carl Morris testified that he was S.H.'s pediatrician. He first saw S.H. on May 27, 2003, when she was five days old. He described S.H. as a normal baby. On June 8 and 23, he treated S.H. for thrush and congestion. On June 23, S.H. was brought in for her one month "well baby" check-up. Dr. Morris described this check-up as a "head-to-toe exam." Dr. Morris did not recall S.H. exhibiting any signs of pain during this check-up. Dr. Morris did not see S.H. again until July 15. At this time, Dr. Morris noted that S.H. was wearing the brace from her emergency room visit two days ago. Her foot was swollen with patchy areas of redness around her ankle. Dr. Morris recalled that S.H. cried vociferously when her right leg was moved a tiny bit, but she did not react to any movement of her left leg. According to Dr. Morris, S.H.'s crying was an indicator of the extreme pain she felt. Based on S.H.'s reaction to the leg movement, Dr. Morris believed her leg may have been broken and ordered more x-rays.

Dr. Morris testified that he examined S.H. again on July 24, 2003. After the examination, he referred S.H. to Children's Hospital for a full-body x-ray. Based on his own observations and the reports from Children's Hospital, Dr. Morris opined that to a reasonable medical certainty S.H. had been abused. However, Dr. Morris acknowledged that his medical definition of child abuse included passive neglect that causes injury to a child. Dr. Morris also explained that "reasonable medical certainty" meant that it was "more probable than not." Dr. Morris reiterated that during his examination of S.H. on June 23, he did not observe any signs that S.H.'s ribs were fractured or that she was in pain as a result. Dr. Morris stated that S.H. had a delay in rolling over in her fourth month of development. Dr. Morris opined that S.H.'s developmental delay may have been caused by her injuries. However, Dr. Morris noted that S.H. was doing fine now.

-5-

Dr. Mark Turner testified that he was the orthopedic surgeon who examined S.H. on July 16, 2003. According to Dr. Turner, S.H. had a "rather swollen" right lower leg at the time. As a result, S.H.'s leg was placed in a splint to keep it immobile. On July 29, 2003, Dr. Turner confirmed Dr. Roberts' reading of the full-body x-rays and diagnosed S.H. with non-accidental trauma. Dr. Turner noted that S.H.'s fractures had started to heal by this time and her progress needed to be followed to ensure that her injuries had no permanent effect. Dr. Turner explained that many of S.H.'s fractures were near the growth plates; and therefore, she would have to be watched for potential bone deformity or limb length inequality. Dr. Turner stated that he saw S.H. in October of 2004, and she was walking by then and appeared to be fine.

Pam Silcox, the victim's grandmother, testified that after her daughter Amanda went back to work, she took care of S.H. for two or three days before the defendant began caring for her. She stated that S.H. appeared to be okay and nothing happened to S.H. while in her care. She noted that her daughter called her when S.H. was first taken to the hospital and she was upset and crying.

Dr. Mary Campbell testified that she specialized in pediatric emergency medicine and did specialty consultations in child abuse cases at Children's Hospital in Knoxville. Dr. Campbell first saw S.H. on July 25, 2003, after she had reviewed the full-body x-rays. She noted that S.H. was in the same physical shape the other doctors had described in the medical history. She observed that S.H. was well-groomed but had a single bruise on her chest and marked swelling on her lower right leg. Dr. Campbell stated that she had ruled out "brittle bone disease" after reviewing S.H.'s medical history. She was aware that the defendant claimed he fell on the stairs with S.H.'s leg caught between him and a stair. However, Dr. Campbell noted that the defendant's story did not explain the other fractures to S.H.'s legs and chest. Dr. Campbell also noted that the delay in S.H.'s care, the dislocation of her foot, and the degree of force causing the other fractures in her legs and chest would be unusual in a simple stair fall. She further noted that "corner" or "bucket-handle" fractures were shown in studies to be "consistent with a twisting of the legs." Accordingly, Dr. Campbell determined that S.H. was the victim of inflicted trauma.

Dr. Campbell testified that S.H.'s medical history indicated she had experienced pain to her right leg. On July 25, Dr. Campbell used facial gradation to determine whether S.H. was suffering any pain and felt S.H. experienced moderate pain. However, she admitted that her consult notes of July 25 stated that S.H. was smiling frequently and only occasionally appeared uncomfortable. Dr. Campbell acknowledged that the only area where she could confidently say S.H. was experiencing pain was her right foot. Dr. Campbell further acknowledged that the only treatment S.H. received for her injuries was the application of the splint. No pain medication was prescribed for S.H. Dr. Campbell also could not totally discount the fact that the injury to S.H.'s right foot could have been sustained in a fall. She further noted that the person responsible for S.H.'s injuries would be aware that the force being delivered was too much and would cause injury though "any caretaker might be unaware that there were injuries to the child."

S.H.'s foster mother testified that she and her husband adopted S.H. in May 2005. She explained that S.H. was released into her care after S.H.'s stay in the hospital in July 2003. Because of S.H.'s injuries, she had to be very careful in handling her. S.H. would cry when her right leg was inadvertently moved during a diaper change. According to her foster mother, S.H. was two years old and doing "as great as a two year old can be." If S.H. was brought into the courtroom, she would scream and run around.

Detective Ronald Boucher of the Oak Ridge Police Department testified that he interviewed Amanda Silcox on July 24, 2003, at the hospital and the defendant on July 25, 2003, at the police station. The defendant told him that while carrying S.H., he fell on the stairs and landed on top of S.H. Afterward, he put S.H. in her crib. A few hours later, he noticed that S.H. had a red mark on her leg. Detective Boucher asked the defendant if he thought S.H.'s leg was broken and the defendant responded that he thought it was but later indicated that he was not sure. Detective Boucher asked the defendant about S.H.'s other injuries, but the defendant did not answer. The defendant told Detective Boucher that he did not have any friends and none of his family would have caused S.H.'s injuries. Detective Boucher testified that the defendant lived less than a half mile from the Oak Ridge Methodist Medical Center. Detective Boucher asked the defendant to write down what happened but the defendant did not do so.

Based on the evidence presented, the jury acquitted the defendant of one count of aggravated child abuse regarding S.H.'s rib fractures, but found the defendant guilty of aggravated child abuse regarding S.H.'s leg fractures. Thereafter, the defendant was sentenced to fifteen years imprisonment.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendant contends that the evidence was insufficient to support his conviction for aggravated child abuse. Specifically, he argues that the evidence presented at trial failed to establish two elements of the offense of aggravated child abuse. First, the evidence was insufficient to prove that he knowingly caused the injuries to S.H. by means other than accident. Second, the evidence was insufficient to prove that S.H. suffered any serious bodily injury. The defendant submits that the evidence presented in this case was purely speculative and to "uphold the verdict of guilt returned against [him] is to impose strict liability against a child's caretaker when the child is injured and the testifying physicians cannot describe how the injury occurred or what a defendant did to cause the injury." The defendant argues that such speculation cannot be deemed proof of guilt beyond a reasonable doubt.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.

1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id*.

The guilt of the defendant as well as any fact required to be proved may be established by direct evidence, by circumstantial evidence, or by a combination thereof. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, the circumstantial evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613.

Relevant to this case, a person commits aggravated child abuse who commits the offense of child abuse and the act of abuse results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402.[3] Child abuse occurs when a person knowingly, other than by accidental means, treats a child under eighteen years of age in such a manner as to inflict injury. *Id.* § 39-15-401. The statute requires that the defendant know the abusive nature of his or her conduct though the defendant need not know that his or her conduct will result in the child's injury. *See State v. Ducker*, 27 S.W.3d 889, 896-97 (Tenn. 2000) (determining that mother must have knowingly left or abandoned her children in the car for more than eight hours in order to be convicted). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). Serious bodily injury is defined as bodily injury which involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. *Id.* § 39-11-106(a)(34).

After a thorough review of the record, we determine that a rational jury could not have found the existence of each element of aggravated child abuse beyond a reasonable doubt. Clearly absent

---

[3] The offense of aggravated child abuse is a Class A felony if the victim is eight years of age or less. *Id*. § 39-15-402(b).

from the record is evidence that the defendant *knowingly, without accident*, treated S.H. in a manner to cause her injuries. Other than proof that the defendant fell on S.H. while walking on the stairs, the state did not present evidence at trial which would have allowed the jury to find that S.H.'s fractures were caused by the *knowing conduct of the defendant*. While we in no wise discount the fact that the state presented evidence that S.H. sustained injuries consistent with abuse, absent proof that the defendant knowingly treated S.H. in an abusive manner, the defendant's conviction cannot stand. The statute requires that the act of treating a child in an abusive manner *must be knowing conduct*. *See Ducker*, 27 S.W.3d at 897. To determine otherwise is to lower the state's burden to prove each and every element of aggravated child abuse beyond a reasonable doubt. To reiterate, circumstantial evidence may not be of such a nature that it merely raises a suspicion or conjecture of guilt; instead, when circumstantial evidence is presented before a jury, i.e., proof of S.H.'s injuries, a "web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw *no other reasonable inference* save the guilt of the defendant beyond a reasonable doubt." *Crawford*, 470 S.W.2d at 613 (emphasis added). This is not the case, and we cannot "speculate a defendant into the penitentiary or permit a jury to do so." *Id.*[4] Accordingly, we reverse the defendant's conviction for aggravated child abuse and remand for the entry of a judgment of acquittal. However, in the event of further appellate review, we will address the defendant's remaining issues.

The defendant also argues that the evidence was insufficient to establish that S.H. suffered serious bodily injury as defined by statute. In the instant case, Dr. Nunley opined that S.H. experienced pain as a result of the injury to her right leg. Dr. Nunley characterized the pain S.H. experienced as extreme pain. However, Dr. Nunley acknowledged that a two-month-old infant would not likely have memory of the pain suffered. Dr. Roberts testified that S.H.'s leg fractures would have been painful for several days until the fractures stabilized and healed. However, Dr. Roberts acknowledged that he did not personally examine S.H.. Dr. Morris, S.H.'s pediatrician, testified that he examined S.H. two days after she was taken to the emergency room. At the time, S.H.'s foot was swollen and she cried vociferously when her right leg was moved. Dr. Morris noted that S.H. had a "distinct pain reaction with that leg." However, Dr. Morris noted that S.H. did not react to movement of her left leg. Dr. Campbell testified that S.H. experienced pain in her right leg over a period of one to two weeks. Dr. Campbell opined that on a scale of one to ten, S.H. experienced a pain level of seven. However, Dr. Campbell acknowledged that S.H. had not been

---

[4] As the dissent correctly observes, the role of the jury "as the trier of fact" is sacrosanct. Undeniably, the jury's verdict of guilt entitles the state to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. However, equally sacrosanct is the state's obligation to prove beyond a reasonable doubt each and every element of the charged offense. Tennessee Code Annotated section 39-15-401 requires the state to prove beyond a reasonable doubt that the defendant knowingly, without accident, treated a child in a manner to cause injury. While the jury is free to draw all reasonable inferences from the evidence, the evidence must be sufficient to support the inference. In this case, little, if any, evidence was presented to allow the jury to infer that the defendant acted knowingly without accident. In fact, the evidence submitted to the jury was that the defendant caused S.H's injuries by accident. Absent some evidence of the defendant's criminal mental state, the jury's conclusion enters the realm of speculation rather than a finding of proof beyond a reasonable doubt.

given any prescription medication for pain. Finally, S.H.'s foster mother testified that S.H. still experienced pain after being released from the hospital.

"Extreme physical pain" has been noted as pain severe enough "to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." *State v. Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). While we note that there is a meaningful difference or distinction between "bodily injury" and "serious bodily injury," the subjective nature of pain is a question of fact to be determined by the jury as the trier of fact. *See State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). Accordingly, we determine that sufficient medical evidence was presented at trial for the jury to find that S.H. experienced extreme physical pain as a result of the fractures to her legs and therefore suffered serious bodily injury. The defendant is not entitled to relief.

### II. Jury Instructions: "Accidental Means"
The defendant next contends that the trial court erred by refusing to give a requested instruction on the definition of "accidental means." He submits that the trial court should have given the requested instruction because the term "accidental means" is expressly mentioned in the child abuse statute, and the jury needed guidance in how to distinguish "knowing conduct" from "accidental means." The defendant further submits that the term "accidental means" is no more in common usage and understandable by persons of ordinary intelligence than the term "knowing" in reference to conduct, yet the term "knowing" is defined at length in the jury charge and its meaning the subject of analysis in many appellate court cases. The defendant asserts that the trial court's substitution of his requested instructions with its own instructions confused the jury and resulted in an unfair trial.

In criminal cases, a defendant has a right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Thus, it follows that the trial court has a duty to give a complete charge of the law applicable to the facts of a case. *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The material elements of each offense should be described and defined in connection with that offense. *See Ducker*, 27 S.W.3d at 899; *State v. Cravens*, 764 S.W.2d 754, 756 (Tenn. 1989). The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis. *Garrison*, 40 S.W.3d at 433-34. However, not all erroneous jury instruction rises to the level of constitutional error. *See State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

Before trial, the defendant filed a motion requesting that the trial court charge the jury with the definition of "accidental means" as set forth in *Brown Shoe Co. v. Reed*, 350 S.W.2d 65, 69

(Tenn. 1961).[5] The trial court declined to give the requested instruction. Instead, the court instructed the jury that aggravated child abuse occurs when a person knowingly, other than by accidental means, treats a child under six years old in such a manner as to inflict injury and the act resulted in serious bodily injury. The court subsequently provided the following definition:

> "Accidental means" means before the defendant can be convicted of the crime submitted to the jury[,] [t]he state must have proven beyond a reasonable doubt that the injuries of the child were brought about as a result of the criminal agency of the defendant; that is, that the injury of the child was due to the unlawful act of the defendant. If the injury was caused by accidental means by the defendant other than by a knowing child abuse, then you would not be justified in finding the defendant guilty. If you find that the defendant's acts, if any, did not unlawfully cause the injuries of the child or if you, the Jury, have a reasonable doubt as to this proposition, you must find him not guilty.

We begin our review by noting that the term "accidental means" is not defined by the child abuse statute or Tennessee Pattern Jury Instructions. We are also mindful that our criminal code provisions should be "construed according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code." *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000) (quoting Tenn. Code Ann. § 39-11-104 (1997)). While a court is free to define "accidental means" in order to help a jury in its deliberations, we note "[w]here words and terms are in common use and are such as can be understood by persons of ordinary intelligence, it is not necessary, in the absence of anything in the charge to obscure their meaning, for the court to define or explain them." *See State v. Summers*, 692 S.W.2d 439, 445 (Tenn. Crim. App. 1985); *see also State v. Adam F. Wester*, No. E2004-02429-CCA-R3-CD, 2006 WL 304700, *10 (Tenn. Crim. App., at Knoxville, Feb. 9, 2006), *perm. app. denied* (Tenn. June 26, 2006) (finding that no instruction on "accidental means" was necessary because the term could be understood by the jury). Here, a review of the jury instructions in their entirety demonstrates that the instructions were sufficiently clear to enable the jury to understand the applicable law. In other words, the jury instructions did not serve to mislead the jury as to the applicable law, nor did the instructions fail to fairly submit the legal issues pertinent to the

---

[5] The defendant's requested instruction was as follows:

> An accident is generally an unlooked for mishap, an untoward event, which is not expected or designed. Generally in most such cases this Court has repeatedly said that a compensable injury should be the result of something happening by accidental means though the act involving the accident was intentional. Accidental means ordinarily mean an effect which was not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing. It is produced by means which were neither designed nor calculated to cause it. It cannot be reasonably anticipated, it is unexpected, it is produced by unusual combinations of fortuitous circumstances and such an injury is an injury by accidental means.

-11-

facts of this case.  Accordingly, we perceive no error and the defendant is not entitled to relief on this issue.

### III. Jury Instructions: Knowingly

The defendant next contends that the trial court improperly refused to instruct the jury in accordance with the defendant's supplemental charge on the mental state of "knowing" as applicable to the aggravated child abuse statute.  The defendant submits that the Tennessee Pattern Jury Instructions on the knowing element of child abuse are too generic and incomplete in light of *State v. Ducker*, where our supreme court indicated that a defendant must know that his treatment of the child is abusive.  The defendant asserts that his supplemental charge was more accurate, more complete, and less misleading than the instruction the trial court used.

Prior to trial, the defendant filed a motion requesting that the trial court supplement the standard jury instruction with the following instruction:

> A defendant must "know" that his treatment of the child is abusive, even if it need not be proven that he "know" that his conduct will result in bodily injury or serious bodily injury.  The state is required to prove beyond a reasonable doubt that the defendant knowingly treated the alleged victim in an abusive manner and knew his conduct was abusive.

The trial court declined to give the requested instruction.  Instead, the court instructed the jury that in order to find the defendant guilty of aggravated child abuse, it must find that the defendant "did knowingly, other than by accidental means (a) treat a child in such a manner as to inflict injury, and (b) the act of abuse resulted in serious bodily injury to the child, and (c) the child was six years of age or less."  The court further instructed the jury as follows:

> Knowingly means that a person acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that certain circumstances exist.  A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.  The requirement of knowingly is also established if it is shown that the defendant acted intentionally. . . .

In the instant case, we note that the trial court's instruction on the term knowingly essentially mirrors the statutory definition and the pattern jury instructions for aggravated child abuse.  *See* Tenn. Code Ann. § 39-11-106(a)(20); T.P.I.-Crim. 21.01.  We have previously noted that when the trial judge gives instructions that correctly, fully, and fairly set forth the applicable law, it is not error to refuse to give a special requested instruction.  "We must review the entire charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law."  *State v. Forbes*,  918 S.W.2d 431, 447 (Tenn. Crim. App. 1995) (internal citations omitted).  In our view, the trial court's instructions sufficiently defined "knowingly" and

-12-

did not lessen the state's burden of proof. As such, we perceive no error and the defendant is not entitled to relief.

### IV. Sequential Jury Instructions

The defendant next contends that the trial court erred by giving sequential jury instructions, i.e., the jury was not to consider a lesser-included offense unless it acquitted the defendant of the greater offense first. Specifically, the defendant submits that it is the jury's duty to determine if a crime has been committed, and additionally, what crime has been committed. Therefore, it "is illogical to give a defendant the right to have his jury instructed on lesser-included offenses and then snatch that right away by telling the jury to ignore those offenses unless and until it acquits of the charge chosen by the state." The defendant asserts that sequential jury instructions violate his right to trial by jury.

The defendant acknowledges that this court has held that sequential jury instructions are proper. *See, e.g.*, *State v. Raines*, 882 S.W.2d 376, 381-82 (Tenn. Crim. App. 1994); *State v. McPherson*, 882 S.W.2d 365, 375-76 (Tenn. Crim. App. 1994); *State v. Rutherford*, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993); *Wester*, 2006 WL 304700, at *11; *State v. Joe A. Gallaher*, No. E2001-01876-CCA-R3-CD, 2003 WL 21463017, *5 (Tenn. Crim. App., at Knoxville, June 25, 2003). However, he asserts that no authoritative legal analysis is undertaken in these cases to support the rationale underlying sequential instructions. He also complains that the Tennessee Supreme Court has acquiesced in this court's approval of the sequential instruction by not ruling on the issue in *State v. Mann*, 959 S.W.2d 503 (Tenn. 1997) (Appendix). He further submits that other jurisdictions have recognized constitutional problems with sequential instructions. *See, e.g.*, *Edge v. State*, 414 S.E.2d 463, 466 (Ga. 1992).

While the defendant is free to argue policy change, the aforementioned Tennessee decisions are presently the controlling authority on this issue. As this court in *Gallaher* stated:

> We are bound by published precedent. *See* Tenn. S. Ct. R. 4(H)(2). Moreover, we view the supreme court's publication of parts of this court's opinion in *Mann* as an appendix to mean more than the court's acquiescence in this court's opinion.

2003 WL 21463017, *5. Accordingly, we conclude that the trial court did not err in giving sequential instructions as the court's instructions in this case comply with controlling precedent in Tennessee. The defendant is not entitled to relief on this issue.

### CONCLUSION

For the aforementioned reasons, the judgment of the trial court is reversed and the case is dismissed.

_____
J.C. McLIN, JUDGE